# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PROJECT FOR PRIVACY AND SURVEILLANCE ACCOUNTABILITY, INC., a Delaware Non-Profit Corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>DEPARTMENT OF DEFENSE and NATIONAL SECURITY AGENCY,<br><br>*Defendants.* | C.A. No. _____ |

## COMPLAINT

Plaintiff Project for Privacy and Surveillance Accountability, Inc. ("PPSA" or "Plaintiff"), a Delaware non-profit corporation, by and through its undersigned counsel, bring this Complaint against Defendants Department of Defense ("DOD") and National Security Agency ("NSA," and together with DOD, "Defendants"), alleging as follows:

1. This Freedom of Information Act ("FOIA") action seeks the timely release of records from Defendant NSA, a component of Defendant DOD, concerning NSA's practice of exploiting the so-called "data broker loophole." This "loophole" allows NSA to purchase commercially available information about

United States citizens that would otherwise only be available after NSA obtains a warrant supported by probable cause.

2.      Whether and to what extent NSA is purchasing such data from third-party vendors without probable cause is a matter of significant national importance.

3.      To understand better how NSA is employing the data broker loophole, Plaintiff PPSA submitted a FOIA request to NSA on July 3, 2024.  *See* Ex. A.

4.      Rather than providing a substantive response to PPSA's FOIA request, NSA issued a blanket denial, invoking the *Glomar* doctrine, which allows agencies to respond to a FOIA request by stating that the agency can neither confirm nor deny the existence of responsive records.  *See ACLU of New Jersey v. FBI*, 733 F.3d 526, 533 (3d Cir. 2013) (citing *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976)).

5.      In doing so, however, NSA failed to first conduct the required search for records.  *See* 5 U.S.C. § 552(a)(3)(C).  In other words, while NSA responded that the only records is has would fall within a *Glomar* response, it did not first search for records to determine whether NSA has other categories of records that would fall outside *Glomar*.

6.      Whatever the justifications for the *Glomar* doctrine generally, they do not absolve an agency of the fundamental obligation to first conduct a search for records.

7. Because NSA fell far short of its statutory responsibility to conduct a search, PPSA seeks an injunction requiring NSA to process its request immediately. Such an injunction would bring NSA into compliance with FOIA. And, after a search is completed, NSA may issue a *Glomar* response if it would be appropriate to do so.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. It may grant declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*, and award costs and attorneys' fees pursuant to 28 U.S.C. § 2412 and 5 U.S.C. § 552(a)(4)(E).

9. Venue lies in this District under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

10. Plaintiff PPSA is a Delaware non-profit corporation with its principal place of business at 300 New Jersey Ave., NW, Suite 300, Washington, DC 20001. As part of its mission, PPSA advocates for greater privacy and civil liberty protections from government surveillance and seeks to hold such programs accountable to constitutional and statutory limitations.

11. Defendant DOD, located at 1400 Defense Pentagon, Washington, DC 20301, is an agency within the meaning of 5 U.S.C. § 552(f)(1), and Defendant NSA, located at 9800 Savage Rd., Suite 6932, Fort Meade, Maryland 20755, is a DOD component that has possession, custody, and control of the records PPSA seeks.

## FACTUAL BACKGROUND

### NSA Purchases Data from Third-Party Vendors

12. On January 27, 2022, the Senior Advisory Group Panel on Commercially Available Information submitted a since-declassified report to Avril Haines, the Director of National Intelligence ("DNI"). *See* Ex. B.

13. That report recognized a growing amount of commercially available information that is available to the intelligence community, and it described the role such information plays in intelligence collection and analysis. *See id.*

14. In particular, the report explained that commercially available information "includes information on nearly everyone that is of a type and level of sensitivity that historically could have been obtained, if at all, only through targeted (and predicated) collection, and that could be used to cause harm to an individual's reputation, emotional well-being, or physical safety." *Id.* at 2-3.

15. The report further recognized that, notwithstanding its sensitive nature, such information was "generally less strictly regulated" than other forms of information subject to the United States Constitution and federal statutes. *Id.* at 1.

16. The report also stressed that, although commercially available information *could* legally be purchased, the intelligence communities' then-extant policies "may not accord sufficient protection to information that is now broadly understood to be sensitive." *Id.* at 1-2.

17. Accordingly, the report recommended that intelligence community members like NSA "catalog, to the extent feasible, the acquisition and use of [commercially available information]," "develop a set of standards and procedures for [commercially available information]," and "develop more precise sensitivity and privacy-protecting guidance for [commercially available information]." *Id.* at 2.

18. The report also cited an internal NSA policy memorandum that identifies "information that is commercially acquired" as a "collection opportunit[y]." *Id.* at 30.

19. That internal NSA policy memorandum, entitled NSA/CSS Policy Memorandum 2021-01, is likely itself responsive to PPSA's request, and it would not fall within a *Glomar* response as the Government has already acknowledged its existence and has described its contents.

## The Intelligence Community Further Acknowledges That It Purchases Commercially Available Information

20. Since the 2022 report, the intelligence community has again acknowledged that it purchases commercially available information without first seeking to obtain a warrant.

21. For instance, in May 2024, the Office of the Director of National Intelligence ("ODNI") issued an unclassified report titled the "Intelligence Community Policy Framework for Commercially Available Information." *See* Ex. C.

22. That policy framework governs "access to and collection and processing of [commercially available information] by elements of the [intelligence community], as defined by the National Security Act of 1947," including NSA. *See* Ex. C at 2 n.2; 50 U.S.C. § 401a(4)(C).

23. Like the 2022 declassified report, this policy framework report recognizes that the intelligence community "access[es], collect[s], and process[es]" commercially available information "in pursuit of mission imperatives," and the report finds such information to have "critical intelligence value." Ex. C at 1.

24. The policy framework report thus "establishes general principles governing the [intelligence community's] access to and collection and processing of all [commercially available information]" and, more specifically, "the [intelligence community's] access to and collection and processing of certain sensitive forms of" commercially available information. *Id.* at 1.

25. For instance, NSA must "report to ODNI on the procurement of, access to, or collection of Sensitive [commercially available information] on an annual basis." *Id.* at 10.

26. Additionally, there are instances when NSA must also explain to ODNI why it deems certain commercially available information to not be sensitive. For instance, if another element of the Intelligence Community "deemed the same or similar" commercially accessible information to be sensitive, NSA must submit an explanation for why it reached a contrary conclusion. *Id.*

27. ODNI must then take the information provided by these reports and make it available to all elements of the intelligence community. *Id.*

28. ODNI must also provide "a report to the public every two years regarding the [intelligence community's] access to and collection, processing, and safeguarding of" sensitive commercially available information. *Id.*

29. Despite these general principles, the 2024 policy framework report expressly "allow[s] individual [intelligence community] elements flexibility to experiment in the manner best suited to both meet the element's operational needs and protect privacy and civil liberties." *Id.* at 2.

## The FOIA Request

30. Following the declassification of the 2022 report to Avril Haines, PPSA submitted a FOIA request to NSA seeking "records that would reveal important information about the agency's purchase of commercially available data." *See* Ex. A.

31. Specifically, PPSA requested the following categories of records:

7

- All records reflecting purchases of commercially available data on U.S. persons and U.S. businesses entities. Responsive records include those that detail the amount of money spent on such purchases, the size of the datasets purchased (e.g., number of persons and/or organizations), and the source(s) of the data. Responsive records for this subpart do *not* include the underlying personal data that the agency acquired;

- All records reflecting the frequency with which the agency acquires data on U.S. persons or business entities from third-party data brokers;

- Any records reflecting the number of foreign or domestic data vendors from which the agency purchases commercially available data about U.S. persons or business entities; and

- All records reflecting the categories of commercially available information that the agency acquires from third-party data vendors. Responsive records for this subpart do *not* include the underlying personal data that the agency acquired.

*See* Ex. A.

32. As PPSA explained in its request, it was concerned "by the extent to which U.S. law enforcement and intelligence agencies may be collecting Americans' private data in bulk, without their knowledge, without probable cause, without meaningful judicial oversight, and in a format that is already detailed, encyclopedic, and effortlessly compiled." *Id.* at 1.

## The NSA's Response

33. By letter dated July 25, 2024, NSA issued its response letter, which acknowledged receipt of the request and assigned it Case Number 118955. *See* Ex. D.

34. In that same letter, NSA also issued a so-called *Glomar* response: "[D]isclosure of the existence or non-existence of the requested information would be harmful to an interest that is protected" by two exemptions to FOIA. *Id.*

35. Despite PPSA's expressly excluding from its request any personal data that NSA obtained pursuant to the data broker loophole, NSA nonetheless stated that "the fact of the existence or non-existence of the materials" PPSA requested was itself classified under Executive Order 13526 and therefore exempt under FOIA Exemption 1. *See id.* (citing 5 U.S.C. § 552(b)(1)).

36. NSA also stated that the existence *vel non* of such records is exempt under FOIA Exemption 3, which shields records from disclosure when "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3).

37. To support its claim that FOIA Exemption 3 applied, NSA invoked 18 U.S.C. § 798, 50 U.S.C. § 3024(i), and 50 U.S.C. § 3605. *See* Ex. D.

38. After categorically invoking FOIA Exemptions 1 and 3, NSA declined to even conduct a search for records.

39. NSA's failure to search for and produce responsive records violates FOIA. *See* 5 U.S.C. § 522(a)(3)(A). Moreover, NSA's failure to search deprives the public of necessary and important information with which to hold the government accountable.

40. This failure also makes it impossible for NSA to conduct the statutorily required segregability analysis of responsive records and for the judicial branch to engage in the *in camera* review that FOIA expressly contemplates as a means of ensuring compliance with FOIA's terms. *See* 5 U.S.C. § 552(a)(4)(B), (8)(A).

41. Accordingly, by invoking *Glomar* to avoid searching for responsive records, NSA violated FOIA's terms and frustrated its purpose.

### PPSA Appealed NSA's Response

42. On August 28, 2024, PPSA appealed NSA's *Glomar* response. *See* Ex. E.

43. Since then, PPSA has not received any response to that appeal or to its FOIA request.

### COUNT I
### (Violation of FOIA, 5 U.S.C. § 552)

44. PPSA incorporates by reference all foregoing paragraphs as if set forth fully herein.

45. DOD is an agency of the federal government within the meaning of 5 U.S.C. § 552(f), and NSA is a DOD component.

46. By letter dated July 3, 2024, PPSA submitted a FOIA request to NSA.

47. That request reasonably described the records requested, and conducting a search for those records would not be unduly burdensome.

48. By letter dated July 25, 2024, NSA denied the request and administratively closed it.

49. On August 28, 2024, PPSA administratively appealed NSA's denial.

50. To date, PPSA has not received any further response from NSA regarding the request or PPSA's administrative appeal.

51. As more than 20 days have passed since PPSA appealed the denial of its FOIA request, it has thus exhausted its administrative remedies with respect to the request.

52. Although NSA invoked two FOIA exemptions, the requested records are not categorically exempt from FOIA pursuant to 5 U.S.C. § 552(b).

53. As to Exemption 1, before invoking that exemption, an agency must show that any records withheld are "classified in accordance with the procedural criteria of the governing Executive Order," here Executive Order 13,526, "as well as its substantive terms." *Lesar v. U.S. Dep't of Just.*, 636 F.2d 472, 483 (D.C. Cir. 1980).

54. Given that requirement, NSA cannot show that *all* responsive records are properly classified under Executive Order 13526 without first searching for responsive documents and then conducting a document-by-document classification review.

55. As to NSA's claim that FOIA Exemption 3 applies, none of the statutes it cites shields it from first conducting a search to determine whether any federal statute forbids it from releasing responsive records.

56. For instance, as 18 U.S.C. § 798 forbids the disclosure of classified documents, NSA cannot rely on this statute under Exemption 3 until it first conducts a search for records and determines that each responsive record is properly classified.

57. The next statute NSA cites—50 U.S.C. § 3024(i)(1)-(2)—only authorizes withholding to protect "intelligence sources and methods," but requires intelligence records to be prepared "in such a way that source information is removed to allow for dissemination … in unclassified form to the extent practicable."

58. This statute thus presupposes that some documents touching on "intelligence sources and methods" will be available in some form to the public and cannot be the basis for a sweeping invocation of Exemption 3.

59. Finally, 50 U.S.C. § 3605 forbids "the disclosure of . . . any information with respect to the [NSA's] activities." But that statute's use of "activities" must be read narrowly to avoid allowing Exemption 3 to swallow all documents related to the NSA.

60. In any event, since ODNI has publicly acknowledged that NSA—like other members of the intelligence community—purchases commercially available

12

information, NSA cannot seek to hide responsive records. *See Venkataram v. Off. of Info. Pol'y*, 590 F. App'x 138, 139 (3d Cir. 2014) (unpublished) ("[W]hen an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information.") (quoting *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013)).

61. Indeed, the express mention of NSA/CSS Policy Memorandum 2021-01 in the declassified Exhibit B (at 30) shows that, at the very least, NSA cannot assert *Glomar* as to the existence *vel non* of that document. Moreover, this public acknowledgement of a policy document undermines any additional attempt to rely on *Glomar* to avoid conducting any search for responsive records.

62. Instead, NSA must search for records and identify any that might be responsive and non-exempt before asserting *Glomar* over exempt documents.

63. But even putting aside the responsive record referenced in the declassified report, NSA's failure to even conduct a search for responsive, non-exempt records plainly violates FOIA, 5 U.S.C. § 522(a)(3)(A), as well its implementing regulations, 28 C.F.R. § 16.1, *et seq.*

64. PPSA is therefore entitled to receive all responsive non-exempt records from the NSA.

## **PRAYER FOR RELIEF**

PPSA respectfully requests that the Court:

13

A. Order NSA to conduct searches immediately for all records responsive to PPSA's FOIA request and demonstrate that it employed search methods reasonably likely to lead to the discovery of records responsive to that request.

B. Order NSA to produce, by dates certain, all non-exempt records to PPSA's FOIA requests, and a *Vaughn* index of any responsive records withheld under claim of exemption;

C. Enjoin NSA from continuing to withhold non-exempt records responsive to PPSA's FOIA request;

D. Grant PPSA attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

E. Grant PPSA such other relief as the Court deems just and proper.

Dated:  December 4, 2024                       HALLORAN FARKAS + KITTILA LLP

*Of Counsel:*

                                               /s/ Theodore A. Kittila
Gene C. Schaerr*                               Theodore A. Kittila (Bar No. 3963)
Brian J. Field*                                5722 Kennett Pike
Joshua J. Prince *                             Wilmington, Delaware 19807
SCHAERR | JAFFE LLP                            Tel:  (302) 257-2025
1717 K St. NW, Suite 900                       Fax:  (302) 257-2019
Washington, DC 20006                           Email:  tk@hfk.law
Tel: (202) 787-1060
Email:  gschaerr@schaerr-jaffe.com             *Counsel for Plaintiff*
        bfield@schaerr-jaffe.com
        jprince@schaerr-jaffe.com

*Motions pro hac vice forthcoming